## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | |
| YALE UNIVERSITY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| _____ | ) | |

## **COMPLAINT**

Plaintiff, United States of America, alleges as follows:

## **INTRODUCTION**

1.       The United States brings this action to enforce Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d to 2000d-7, and to "assur[e] that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion).

2.       For at least 50 years, Defendant Yale University (Yale) has intentionally subjected applicants to Yale College to discrimination on the grounds of race and national origin.[1]  For the last few decades, Yale's oversized, standardless, intentional use of race has subjected domestic, non-transfer applicants to Yale College to discrimination on the ground of race.

---

[1] Hereinafter, references to "race" include "national origin."

1

3.      Yale's race discrimination includes imposing undue and unlawful penalties on racially-disfavored applicants, including in particular most Asian, and White applicants.

4.      Yale has engaged in this race discrimination despite receiving millions of dollars of federal taxpayer funding subject to Title VI's restrictions.  Yale's race discrimination violates Title VI's requirement that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

5.       Yale's race discrimination injures applicants and students.  Yale does this in various ways.  Yale subjects applicants to Yale College to discrimination on the ground of race.  And, because Yale claims that its race discrimination is necessary to admit sufficient numbers of racially-favored applicants, mostly Black and Hispanic applicants, Yale signals that racially-favored applicants cannot compete against Asian and White applicants.  This kind of race discrimination relies upon and reinforces damaging race-based stereotypes.

6.      Yale's system of race discrimination assigns value to applicants based on racial categories per se – apart from the applicants' personal and individual challenges pursuing educational opportunities.

7.      Yale's use of race in undergraduate admissions to Yale College is not narrowly tailored to a compelling interest.

8.      Yale has not articulated or established a compelling interest with sufficient clarity; that is, Yale has not demonstrated an interest that is sufficiently measurable to

2

permit judicial scrutiny.  Rather, Yale vaguely asserts a purported compelling interest in the educational benefits of diversity, without sufficiently defining its diversity goals, without articulating any standards to measure achievements of its diversity goals, and without indicating what actions or results would satisfy its diversity goals.

9.      Yale's race discrimination is not narrowly tailored.  Rather, Yale employs an oversized, standardless, uncabined use of race in undergraduate admissions to Yale College.  Yale's insufficiently tailored use of race annually infects thousands of decisions about admission to Yale College.

10.     Yale purports to utilize a "holistic" review of applicants to Yale College in which race is "one factor among many."  In reality, Yale's use of race is significant and the determining factor for hundreds of applicants each admissions cycle.

11.     Yale's race discrimination does not limit race to merely a "plus" factor as part of Yale's purported "holistic" review of applications.  Instead, Yale engages in race discrimination at multiple steps of its multi-step admissions process.

12.     Yale's untailored race discrimination is not time limited.  Yale's race discrimination is longstanding, and Yale intends to continue discriminating against most Asian, and White applicants to Yale College on the ground of race.

13.     Because of Yale's race discrimination, Asian and White applicants have a significantly lower chance of admission to Yale College than do similarly-situated Black and Hispanic applicants.[2]

---

[2] This Complaint uses the terms "Asian," "Black," "Hispanic," and "White" because Yale's admissions process uses those terms to track the race of Yale College applicants.

14.     Yale's violation of Title VI includes subjecting domestic, non-transfer Asian and White applicants to Yale College to unlawful discrimination on the ground of race.

15.     The United States seeks declaratory, injunctive, and damages relief to remedy Yale's discriminatory conduct and to protect the civil rights of all applicants to Yale College.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a), and 1345.

17.     The United States is authorized to initiate this action against Yale under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7.

18.     Declaratory, injunctive, and damages relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 2000d to 2000d–7 .

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  The Defendant is located in Connecticut, and a substantial part of the events or omissions giving rise to this cause of action took place in this judicial district.

20.     All conditions precedent to filing suit have been satisfied.

## PARTIES

21.     Plaintiff is the United States of America.

22.     Defendant Yale University, also known as the President and Fellows of Yale College, is a private university located in New Haven, Connecticut, within this judicial district.

23.     Defendant Yale receives federal financial assistance, including from the United

States Department of Justice and other agencies.  For example, the Department of Health

and Human Services alone provides over $630 million in financial assistance to Yale

University each year.

24.     As a recipient of federal funds, Yale is responsible for ensuring – and it has made

contractual assurances that it will ensure – that the programs or activities to which it

distributes those funds comply with federal law, including Title VI.

## FACTUAL ALLEGATIONS

### Yale

25.     Yale University was founded in 1701 as the "Collegiate School."  In 1718, the

Collegiate School became Yale College in honor of Elihu Yale.

26.     Yale is a large university with a wide array of programs, departments, schools,

centers, museums, and many affiliated organizations.

27.     Yale is a member of the Ivy League, and includes a highly selective

undergraduate college, Yale College, with a total enrollment of over 6000

undergraduates.

### Yale's Historical Use of Race

28.     Yale began preferring certain races over others among applicants by at least the

1970s.

29.     In or about the 1970s, Yale defined racially-favored applicants as Black,

Hispanic, American Indian, and Asian.

30.     In or about 1986, Yale's admissions documents show it sought for "minority students [ ] to occupy a certain preset percentage of all available places" at Yale College.

31.     In approximately the late 1980s, Yale removed most Asian applicants from its list of racially-favored groups.

32.     Yale subsequently abandoned acknowledgement of such explicit "preset" quotas. However, Yale continues to subject applicants to discrimination on the ground of race.

33.     Yale admits that it intentionally uses race in admissions.

34.     Yale has stated that it "considers it a plus factor if a candidate identifies as a member of an underrepresented racial/ethnic group."

### The Investigation

35.     In 2016, the United States Department of Justice received a complaint from a coalition of over 130 Asian-American organizations alleging that Yale discriminates against Asians in Yale's undergraduate admissions to Yale College.

36.     On April 5, 2018, the United States notified Yale that the United States had commenced a Title VI investigation into alleged discrimination in Yale's undergraduate admissions to Yale College.

37.     On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI.

38.     The United States offered Yale an opportunity for voluntary compliance without litigation.  Yale declined the United States' offer.  The United States notified Yale of its determination that efforts to obtain voluntary compliance were unsuccessful.

**Yale's Admissions Process**

39.     Every year, tens of thousands of high school students apply for admission to Yale College.

40.     For example, in the 2018-2019 admissions cycle, Yale received over 35,000 applications for admission to Yale College.  Yale extended offers of admission to approximately 2200 applicants.  Of those, approximately 1560 applicants accepted offers of admission to attend Yale College in the fall of 2019.

41.     Yale's application process involves multiple steps.

42.     Yale applicants must submit electronically an application containing, among other items:  a completed application form; a school report, including a high school transcript; standardized test scores, including either SAT or ACT test results; letters of recommendation; and essays and/or responses to short answer questions.

43.     The application forms used by Yale invite applicants to identify their race and ethnicity.

44.     If an applicant declines to identify the applicant's race, Yale may make its own determination of an applicant's race from any materials submitted in an application and/or from in-person interviews.

45.     Yale tracks each applicant's race.

46.     At each step of Yale's admissions process, the Yale admissions official evaluating an applicant knows the applicant's race if it is identified in any portion of the applicant's application.

7

47.     Yale treats applicants differently based on their race.  Yale favors some applicants because of their race.  Yale penalizes other applicants because of their race.

48.     Racially-favored applicants include applicants who identify, at least in part, as Black, Hispanic, Native American, or Pacific Islander.

49.     Racially-favored applicants also include applicants who identify, at least in part, as belonging to a favored Asian-American subgroup, such as applicants who identify as Cambodian, Hmong, Laotian, or Vietnamese.

50.     For purposes of this Complaint, references to Asian applicants exclude racially-favored Asian applicants who identify, at least in part, as from a favored Asian-American subgroup, such as applicants who identify as Cambodian, Hmong, Laotian, or Vietnamese.

51.     Racially-penalized applicants include applicants who identify as Asian and/or White.

52.     Yale uses a multi-step admissions process through which domestic, non-transfer applicants must pass to be admitted to Yale College.

53.     Yale follows its multi-step process during two different admission processes each admissions cycle – an early admissions process and a regular admissions process.

54.     The early admissions process occurs from approximately November 1 to approximately December 15, and the regular admissions process occurs from approximately January 2 to approximately April 1.

55.     Applicants who apply during the early admissions process may be accepted, rejected, or deferred to the regular admissions process.

56.     Applicants who apply during the regular admissions process may be accepted, rejected, or placed on a waitlist.

57.     The deadline for students admitted through both the early admissions process and the regular decision process to accept Yale's admissions offer is approximately May 1.

58.     Waitlisted applicants may be offered admission to Yale College if slots are available in the entering first-year class after admitted applicants notify Yale whether they accept Yale's admission offer.

**The "Reader" Process**

59.     Yale has divided the domestic and international areas from which it receives applications into approximately 30 areas, including approximately 22 domestic areas, to which an admissions officer referred to as an "Area Officer" is assigned.

60.     Admissions officers are assigned to teams, including a diversity team that reviews applications submitted by racially-favored applicants and a subset of racially-penalized applicants whom Yale has determined to be from a low-income background or the first in the applicant's family to potentially attend college.

61.     Admissions officers serve as "readers" who review each applicant's file.  Yale refers to these reviews as "reads."

62.     An application must receive at least two reads for an applicant to be admitted to Yale.  An application may receive as many as three reads.

63.     Yale refers to the admissions officer who performs the first read as the "First Reader."  The Area Officer typically conducts the first read on applications from the officer's area.

64.     The First Reader knows the applicant's race if it is identified in the applicant's application.

65.     Yale instructs First Readers to consider an applicant's race when reviewing each application.   First Readers follow and act on Yale's instruction about the use of race.

66.     First Readers assign applicants an overall reader rating of 1 to 4, including some plus or minus options, with "1" being the best rating.  First Readers may also assign a 5 if an application file is incomplete.  Ratings with a "+" (plus sign) after a number are better than a rating without a "+."  For example, a 2+ is a better rating than a 2, and a 2++ is a better rating than a 2+.  Ratings with a "-" (minus sign) after a number are worse than a rating without a "-" (minus sign).  For example, a 2- is a worse rating than a 2.

67.     Yale instructs First Readers to treat the race of a racially-favored applicant as a positive factor when assigning overall reader ratings.  First Readers follow and act on Yale's instruction about the use of race.

68.     First Readers consider race to be a positive factor when assigning an overall reader rating to Yale's racially-favored applicants.

69.     First Readers are significantly more likely to assign racially-favored applicants a better overall rating of 2+ or 2 than similarly-situated racially-penalized applicants.

70.     First Readers significantly favor racially-favored applicants when assigning overall reader ratings because of the applicants' race and significantly penalize racially-penalized applicants when assigning overall reader ratings because of the applicants' race.

71.     Yale refers to the admissions officer who performs the second read as the "Second Reader."

72.     First Readers have broad discretion to determine which applications the First Reader will refer for a second read.

73.     If an application does not receive a second read, Yale rejects the applicant.

74.     First Readers generally refer applications for a second read if the First Reader has assigned the application an overall reader rating of 2 or better.

75.     First Readers generally do not refer applications for a second read if the First Reader has assigned the application an overall reader rating below 2.

76.     Yale instructs First Readers to refer applications from racially-favored applicants for a second read by the diversity team during the early admissions process if the First Reader assigned the applicant an overall reader rating of 2- or above.  First Readers follow and act on Yale's instruction about the use of race.

77.     Yale instructs First Readers to refer applications from racially-penalized applicants for a second read by the diversity team during the early admissions process if the First Reader assigned the applicant an overall reader rating of 2- or above only if the racially-penalized applicant is from a low-income background or the first in the applicant's family to potentially attend college.  First Readers follow and act on Yale's instruction about the use of race.

78.     First Readers generally refer applications from racially-favored applicants for a second read by the diversity team during the early admissions process if the First Reader assigned the applicants an overall reader rating of 2-.

11

79.    First Readers generally do not refer applications from racially-penalized applicants for a second read by the diversity team during the early admissions process if the First Readers assigned the applicants an overall reader rating of 2-.

80.    First Readers are much more likely to refer racially-favored applicants whom they assigned an overall rating of 2- for a second read during the early admissions process than First Readers are to refer racially-penalized applicants whom they assigned an overall rating of 2- during the early admissions process.

81.    The Second Reader knows the applicant's race if it is identified in the applicant's application.

82.    Yale instructs Second Readers to consider an applicant's race when reviewing each application.  Second Readers follow and act on Yale's instruction about the use of race.

83.    Second Readers assign applicants an overall reader rating according to the same number rating scale as First Readers.

84.    Yale instructs Second Readers to treat the race of a racially-favored applicant as a positive factor when assigning overall reader ratings.  Second Readers follow and act on Yale's instruction about the use of race.

85.    Second Readers consider race to be a positive factor when assigning an overall reader rating to Yale's racially-favored applicants.

86.    Second Readers are significantly more likely to assign racially-favored applicants a better overall rating of 2+ or 2 than similarly-situated racially-penalized applicants.

87.    Second Readers significantly favor racially-favored applicants when assigning overall reader ratings because of the applicants' race and significantly penalize racially-penalized applicants when assigning overall reader ratings because of the applicants' race.

88.    Yale includes the overall reader rating of every reader who reviews an application in materials considered by the admissions committees described below.

### The Committee Process

89.    Once the reading process is complete, an "Area Committee" meets for each area to  review applications received from that area.

90.    Area Committees meet during both the early admissions process and the regular admissions process.

91.    Yale maintains a list of applicants from each area.  Yale refers to this list as the area "slate."

92.    The slate includes all reader overall ratings.

93.    The slate includes each applicant's race, if known.

94.    Area Officers have a copy of their area slate.

95.    Area Officers select applicants from their slate to present to their Area Committee.

96.    Yale instructs Area Officers to treat the race of a racially-favored applicant as a positive factor when selecting applicants to present to their Area Committee.  Area Officers follow and act on Yale's instruction about the use of race.

97.     Area Officers consider the race of a racially-favored applicant to be a positive factor when selecting applicants to present to their Area Committee.  Area Officers consider the race of a racially-penalized applicant to be a negative factor when selecting applicants to present to their Area Committee.

98.     Area Officers present each of their selected applicants to their Area Committee for evaluation.

99.     Area Committees may request to discuss applicants listed on the slate whom the Area Officer has not presented.

100.    During the early admissions process, Area Committees vote whether to admit or reject, or to defer for consideration during the regular decision process, each applicant presented to the Area Committee.

101.    During the regular admissions process, Area Committees vote whether to admit, reject, or waitlist each applicant presented to the Area Committee.

102.    Yale instructs members of Area Committees to treat the race of a racially-favored applicant as a positive factor when voting on applicants.  Members of Area Committees follow and act on Yale's instruction about the use of race.

103.    Area Officers consider the race of racially-favored applicants to be a positive factor when voting on applicants.

104.    Area Committees consider race in order to achieve a class with a racial composition similar to the racial composition of the class from the prior admissions cycle.

105.    Area Committees admit racially-favored applicants at a significantly higher rate than they admit similarly-situated racially-penalized applicants.

106.    Area Committees admit racially-favored applicants at a significantly higher rate than they admit similarly-situated racially-penalized applicants because the Area Committees subject applicants to discrimination on the ground of their race.

107.    After the Area Committees vote on applicants during the regular admissions process, Yale's admissions office determines whether the number of applicants admitted by the Area Committees exceeds the number of available slots for the incoming class.

108.    After the Area Committees vote on applicants during the regular admissions process, Yale's admissions office analyzes the racial composition of the admitted applicants.

109.    Based on the racial analysis discussed in paragraph 108, Yale's Dean of Admissions determines whether the racial composition of the admitted applicants needs to be adjusted to achieve Yale's desired racial balance.

110.    Yale's Dean of Admissions informs the Area Officers of the racial composition of the applicants admitted by the Area Committees.

111.    Yale's Dean of Admissions informs each Area Officer how many admitted applicants need to be waitlisted or rejected from their area.

112.    Yale may reconsider an Area Committee's decision to admit an applicant and change the decision from admit to either waitlist or reject.  Yale refers to this as "bopping."

113.    A "Final Review Committee" reconsiders Area Committee votes to accept, reject, or waitlist applicants.

114.    The Final Review Committee may vote to waitlist or reject applicants whom an Area Committee admitted.

115.    The Final Review Committee may vote to admit applicants whom an Area Committee voted to waitlist or reject.

116.    Area Officers select applicants to present to the Final Review Committee for reconsideration.

117.    Yale instructs Area Officers to treat the race of a racially-favored applicant as a positive factor when selecting applicants to present to the Final Review Committee.  Area Officers follow and act on Yale's instruction about the use of race.

118.    Area Officers consider the race of a racially-favored applicant to be a positive factor when selecting applicants to present to the Final Review Committee.   Area Officers consider the race of a racially-penalized applicant to be a negative factor when selecting applicants to present to the Final Review Committee.

119.    Area Officers present their selected applicants to the Final Review Committee for evaluation.

120.    The Final Review Committee may request to discuss applicants on the slate whom the Area Officer has not presented.

121.    The Final Review Committee votes to waitlist or reject applicants whom the Area Committees voted to admit.

122.   The Final Review Committee votes to admit applicants whom the Area
Committees voted to waitlist or reject.

123.   Yale instructs members of the Final Review Committee to treat the race of a
racially-favored applicant as a positive factor when voting on applicants.  Members of the
Final Review Committee follow and act on Yale's instruction about the use of race.

124.   Members of the Final Review Committee consider race to be a positive factor
when voting on racially-favored applicants.

125.   Members of the Final Review Committee consider race to be a negative factor
when voting on racially-penalized applicants.

126.   The Final Review Committee uses race to admit racially-favored applicants to
achieve a racially-balanced class

127.   The Final Review Committee uses race during a "bopping" process which is one
of several points during the admissions process when Yale takes steps to achieve a
racially balanced class.

128.   Yale has "bopped" racially-penalized applicants based on race to admit more
racially-favored applicants and racially balance Yale's admitted class.

**The Admitted Class Composition and Admit Rates**

129.   Yale's racially-favored applicants predominantly include applicants who identify
as Black and/or Hispanic.

130.   The United States Department of Education's National Center for Education
Statistics maintains the Integrated Postsecondary Education Data System (IPEDS) for
postsecondary education data collection.

131.   IPEDS requires postsecondary institutions to use a two-part question to collect and report ethnicity and race data.  The first part of the question collects ethnicity and asks whether the applicant is "Hispanic or Latino."  The second part of the question collects race and asks whether the applicant is one or more of five listed racial categories.

132.   If an applicant identifies as "Hispanic or Latino," IPEDS categorizes the applicant as "Hispanic" regardless of whether the applicant also identifies as one or more of the racial categories.  If the applicant identifies as only one of the listed racial categories, the applicant is categorized as that racial category.  If the applicant identifies as more than one of the racial categories, the applicant is categorized as "Two or more races."  If the applicant does not identify an ethnicity or race, the applicant is categorized as "Unknown race and ethnicity."

133.   Each year for 18 consecutive years, from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of Black and Hispanic applicants admitted to Yale College was higher than the percentage of Black and Hispanic applicants to Yale College.

134.   Each year for 18 consecutive years, from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of Asian applicants admitted to Yale College was lower than the percentage of Asian applicants to Yale College.

135.   For a majority of years from 2000 to 2017, data on domestic applicants and admits using the IPEDS methodology show that the percentage of White applicants

admitted to Yale College was lower than the percentage of White applicants to Yale College.

136.    From 2010 through 2017, Yale engaged in racial balancing of domestic admits by keeping the annual percentage of Black admits within approximately one percentage point of the previous year's admitted class in the IPEDS data.

137.    From 2010 through 2017, Yale engaged in racial balancing of domestic admits by keeping the annual percentage of Asian admits within approximately 1.5 percentage points of the previous year's admitted class in the IPEDS data.  Indeed, in most years the range was only one percentage point or less.

138.    For Black and Asian applicants, and possibly others, Yale uses race to keep the percentage of the admitted applicants within a very narrow range in order to ensure a racially-balanced student body.  In doing so, Yale subjects applicants to discrimination on the ground of race.

139.    In addition to the IPEDS methodology, Yale uses a single ethnicity method of tracking applicants' race in which it categorizes applicants in four major racial groups who identify as more than one race in the following order:  Black, Hispanic, Asian, and White.  Using this method, if an applicant identifies as both Black and White, Yale's single ethnicity method would categorize the applicant as Black.

140.    In 2017 and 2018 (years for which Yale provided data during the Department of Justice's investigation), the admit rates of domestic, non-transfer applicants varied by racial group using Yale's single ethnicity method.  Black applicants had the highest admit

rate followed by Hispanic applicants.  Asian and White applicants had the lowest admit rates.

141.     In 2017 and 2018, the admit rates of domestic, non-transfer applicants with a First Reader overall rating of 2 or better (i.e., 2, 2+, 2++, 1) varied by racial group using Yale's single ethnicity method.  Among these applicants, Black applicants had the highest admit rate, followed by Hispanic applicants.  Asian and White applicants had the lowest admit rates of applicants with a First Reader overall rating of 2 or better.

142.     Most successful applicants to Yale College receive a rating of a 2 or 2+, and Yale subjects such applicants to discrimination on the ground of race in multiple ways.  First, Yale uses race significantly when it determines who will receive a rating of 2 or 2+. Second, Yale uses race significantly when it determines whether to extend offers of admission to applicants who receive a rating of 2 or 2+.

143.     On the ground of race, Yale admits applicants with the same reader scores at different rates.  For example, Yale admits a greater percentage of Blacks having reader scores of 2, as compared to Asians having reader scores of 2.

144.     Yale treats applicants whom it ranks as equal – applicants having the same overall reader scores – differently on the grounds of race.  It discriminates against Asians and Whites, and in favor of Black and Hispanics having the same reader scores.

**The Academic Index**

145.     Yale stresses academic strength of applicants when it evaluates applicants and makes decisions about applicants to Yale College.

146.    Yale's website explains:  "Yale is above all an academic institution. This means academic strength is our first consideration in evaluating any candidate.  The single most important document in your application is your high school transcript, which tells us a great deal about your academic drive and performance over time."

https://admissions.yale.edu/what-yale-looks-for (Last visited October 8, 2020).

147.    Yale uses standardized test scores to evaluate applicants to Yale College.

148.    Yale's website states:  "During the most recent year, test score ranges (25th to 75th percentiles) for enrolled first-years were:

> SAT-Evidence-Based Reading and Writing: 720-770
>
> SAT-Math: 740-790
>
> ACT Composite: 33-35"

https://admissions.yale.edu/what-yale-looks-for (Last visited October 8, 2020).

149.    The Academic Index is a consistent objective standard used by all Ivy League schools, including Yale.  It uses an objective mathematical formula based on a combination of each applicant's SAT or ACT score and the applicant's high school grades.

150.    An Academic Index rating can be calculated for each applicant to Yale College who provided standardized test scores and high school grades.

151.    Yale uses the Academic Index as a metric to determine, at least in part, whether to offer admission to at least a subset of Yale College applicants.  For each such applicant, Yale calculates an Academic Index rating.

152.    Applicants with a higher Academic Index rating have a higher chance of admission to Yale College than applicants with a lower Academic Index rating.

153.    Applicants to Yale College differ significantly in their admission chances based on their race and Academic Index rating.

154.    Dividing Yale's applicants into deciles using Academic Index ratings, with each decile equal to approximately 10% of the applicants, shows the significant differences between applicants' chances for admission to Yale College based on their race.

155.    To illustrate, for example the Tenth Academic Index Decile includes applicants to Yale with approximately the top 10% of Academic Index ratings, greater than the Academic Index ratings of approximately 90% of applicants.

156.    To illustrate, for example the Sixth Academic Index Decile includes applicants to Yale with approximately the top 50-60% of Academic Index Ratings, greater than the Academic Index ratings of approximately 50% of applicants and less than the Academic Index ratings of approximately 40% of applicants.

157.    The admit rates vary significantly for Asian, Black, Hispanic, and White applicants in the same Academic Index Decile.

158.    The admission rates of White, Asian, Black, and Hispanic applicants are depicted on the following table and show significant discrimination on the ground of race.

159.    **Admission Rate by Race/Ethnic Group and Academic Index Decile**

| Deciles | White<br>% admitted<br>Total in decile<br>Total admitted | Asian<br>% admitted<br>Total in decile<br>Total admitted | Black<br>% admitted<br>Total in decile<br>Total admitted | Hispanic<br>% admitted<br>Total in decile<br>Total admitted | Total<br>% admitted<br>Total in decile<br>Total admitted |
|---|---|---|---|---|---|
| 10th | 20.18%<br>(1,526)<br>[308] | 14.32%<br>(2,836)<br>[406] | 60.00%<br>(50)<br>[30] | 34.84%<br>(155)<br>[54] | 17.47%<br>(4,576)<br>[798] |
| 9th | 12.12%<br>(2,137)<br>[259] | 8.17%<br>(2,190)<br>[179] | 51.69%<br>(89)<br>[46] | 28.77%<br>(292)<br>[84] | 12.06%<br>(4,708)<br>[568] |
| 8th | 8.40%<br>(2,225)<br>[187] | 6.20%<br>(1,614)<br>[100] | 48.99%<br>(149)<br>[73] | 21.12%<br>(303)<br>[64] | 9.88%<br>(4,291)<br>[424] |
| 7th | 7.23%<br>(2,545)<br>[184] | 5.29%<br>(1,625)<br>[86] | 38.63%<br>(233)<br>[90] | 22.63%<br>(433)<br>[98] | 9.47%<br>(4,836)<br>[458] |
| 6th | 6.53%<br>(2,311)<br>[151] | 3.83%<br>(1,489)<br>[57] | 27.95%<br>(297)<br>[83] | 18.02%<br>(455)<br>[82] | 8.19%<br>(4,552)<br>[373] |
| 5th | 4.09%<br>(2,301)<br>[94] | 3.54%<br>(1,299)<br>[46] | 20.85%<br>(422)<br>[88] | 13.30%<br>(669)<br>[89] | 6.76%<br>(4,691)<br>[317] |
| 4th | 2.02%<br>(2,273)<br>[46] | 2.49%<br>(1,165)<br>[29] | 12.14%<br>(618)<br>[75] | 5.94%<br>(892)<br>[53] | 4.10%<br>(4,948)<br>[203] |
| 3rd | 0.95%<br>(1,678)<br>[16] | 0.92%<br>(867)<br>[8] | 5.49%<br>(819)<br>[45] | 2.61%<br>(918)<br>[24] | 2.17%<br>(4,282)<br>[93] |
| 2nd | 0.79%<br>(1,522)<br>[12] | 0.50%<br>(806)<br>[4] | 1.46%<br>(1,233)<br>[18] | 0.85%<br>(1,298)<br>[11] | 0.93%<br>(4,859)<br>[45] |
| 1st | 0.38%<br>(1,063)<br>[4] | 0.50%<br>(599)<br>[3] | 0.11%<br>(1,847)<br>[2] | 0.07%<br>(1,350)<br>[1] | 0.21%<br>(4,859)<br>[10] |

160.     The data in paragraph 159 are for Yale's 2017 and 2018 admissions classes of domestic, non-transfer applicants, and excludes athletes (who are subject to a different admissions process), those for whom an academic index could not be calculated, applicants without a First Reader Score, and applicants not categorized using Yale's single ethnicity method as White, Asian, Black, or Hispanic.

161.     For example, the data show the following admit rates of applicants to Yale College in the Eighth Academic Index Decile for admission in 2017 and 2018:  8.40% for White applicants; 6.20% for Asian applicants; 48.99% for Black applicants; and 21.12% for Hispanic applicants.  The overall admit rate for applicants to Yale College in the Eighth Academic Index Decile was 9.88%.  Black applicants in the Eighth Academic Index Decile had nearly 8 times the likelihood of admission as Asian applicants in the same decile.

162.     Similarly, for example, the data show the following admit rates of applicants to Yale College in the Sixth Academic Index Decile for admission in 2017 and 2018: 6.53% for White applicants; 3.83% for Asian applicants; 27.95% for Black applicants; and 18.02% for Hispanic applicants.  The overall admit rate for applicants to Yale College in the Sixth Academic Index Decile was 8.19%.  Black applicants in the Sixth Academic Index Decile had over 7 times the likelihood of admission as Asian applicants in the same decile.

163.     The other deciles show similar disparities by race and ethnicity.

164.     The variation in admit rates for Asian, Black, Hispanic, and White applicants in the same Academic Index decile reflect Yale's significant and untailored use of race, and

24

is not the result of Yale using race as just a "plus factor" in a narrowly tailored way. Race is the determinative factor in many admissions decisions and often determines who is accepted and who is rejected for admission.

### The Marginal Effect of Race

165.    Yale subjects Yale College applicants to discrimination on the ground of race at virtually every step of its admissions process.

166.    Nearly all applicants admitted to Yale receive a First Reader overall rating of 2 or better (i.e., 2, 2+, 2++, 1).  Most admitted applicants receive a rating of 2 or 2+.

167.    Yale discriminates at the First Reader stage of its admissions process.  Significant disparities exist between the First Reader overall ratings assigned to racially-favored applicants and the First Reader overall ratings assigned to similarly-situated racially-penalized applicants.

168.    Significant disparities exist between the First Reader overall ratings assigned to racially-favored applicants and the First Reader overall ratings assigned to similarly-situated racially-penalized applicants because Yale instructs readers to favor racially-favored applicants, and thereby penalize racially-penalized applicants, when assigning these ratings.  Readers follow and act on Yale's instruction about the use of race.

169.    These significant disparities in First Reader overall ratings are excessive, and not the result of Yale using race as just a "plus factor" in a narrowly tailored way.

170.    Yale discriminates at the Second Reader stage of its admissions process. Significant disparities exist between the Second Reader overall ratings assigned to

racially-favored applicants and the Second Reader overall ratings assigned to similarly-situated racially-penalized applicants.

171.    Significant disparities exist between the Second Reader overall ratings assigned to racially-favored applicants and the Second Reader overall ratings assigned to similarly-situated racially-penalized applicants because Yale instructs readers to favor racially-favored applicants, and thereby penalize racially-penalized applicants, when assigning these ratings.  Readers follow and act on Yale's instruction about the use of race.

172.    These significant disparities in Second Reader overall ratings are excessive, and not the result of Yale using race as just a "plus factor" in a narrowly tailored way.

173.    Yale discriminates on the ground of race between applicants its admissions officers view as otherwise comparable.

174.    This discrimination between comparable applicants produces a significant, excessive, untailored effect on the admission chances for competitive applicants whom Yale's readers rated as a 2 or 2+.

175.    For example, the admit rates of applicants with a First Reader overall rating of 2 vary significantly based on race.  The admit rates of Asian and White applicants with a First Reader overall rating of 2 are significantly lower than the admit rates of Black and Hispanic applicants with a First Reader overall rating of 2.

176.    Similarly, the admit rates of applicants with a First Reader overall rating of 2+ vary significantly based on race.  The admit rates of Asian and White applicants with a First Reader overall rating of 2+ are significantly lower than the admit rates of Black and Hispanic applicants with a First Reader overall rating of 2+.

177.    That is, applicants whom Yale's own readers rate as comparable after factoring in race are admitted at significantly different rates based on race.

178.    Yale is significantly less likely to admit Asian and White applicants to Yale College than similarly-situated Black and Hispanic applicants.

179.    The marginal effect of race on the probability of admission for comparable applicants is outcome determinative for hundreds of applicants each admissions cycle.

180.    Because Yale subjects applicants to discrimination on the ground of race, Yale annually rejects hundreds of Asian and White applicants to Yale College who could have been admitted.

### No Time Limits

181.    Yale has subjected applicants to Yale College to discrimination on the ground of race for at least 50 years.

182.    Since Yale started using race in admissions, Yale has not narrowly tailored its use of race and the weight race plays in admission decisions.

183.    Yale intends to continue subjecting applicants to discrimination on the ground of race in admissions to Yale College.

184.    Yale has not placed any time limits on its racially discriminatory admissions process, and Yale does not intend to do so.

185.    Instead of using race in a narrow, time-limited, and targeted manner to achieve specific and defined educational goals, Yale has institutionalized its use of racial preferences as a permanent feature of its admissions process and decisions.

**Race Neutral Alternatives**

186.    Yale has not employed available, workable race-neutral alternatives to the use of race.

187.    Yale has failed or refused to use available, workable race-neutral alternatives to the use of race.

188.    Yale could achieve the educational benefits of diversity exclusively through available, workable race-neutral alternatives.

189.    For example, Yale could emphasize the socio-economic status of applicants as a factor in admissions to achieve the educational benefits of diversity and eliminate Yale's use of race.

190.    For example, Yale could emphasize diversity in applicants' location in the United States, including an emphasis on an array of applicants from inner cities to rural communities, to achieve the educational benefits of diversity and eliminate Yale's use of race.

191.    For example, Yale could emphasize applicants' personal, individual challenges accessing educational opportunities to achieve the educational benefits of diversity and eliminate Yale's use of race.

192.    For example, Yale could eliminate its favoring of legacies, donors, and other special interest applicants to achieve the educational benefits of diversity and eliminate Yale's use of race.

193.    Despite these examples and other available, workable race-neutral alternatives, Yale continues unnecessarily to use race in its undergraduate admissions to Yale College.

**Yale Is a Recipient of Federal Financial Assistance**

194.    At all relevant times described in this complaint, Yale has been, and continues to be, a recipient of federal financial assistance from the United States Department of Justice and other federal agencies.

195.    By accepting federal financial assistance, Yale agreed to comply with all requirements imposed by Title VI and the federal regulations implementing Title VI.

196.    As a condition of receiving federal financial assistance, Yale explicitly certified it agreed to comply with all requirements imposed by Title VI and the federal regulations implementing Title VI.

197.    On August 13, 2020, the United States notified Yale that it had failed to comply with Title VI, its implementing regulations, and related contractual assurances.  That August 13, 2020, notice also invited Yale to comply voluntarily with Title VI

198.    The United States subsequently determined that efforts to obtain voluntary compliance were unsuccessful.

199.    The United States notified Yale of its determination that efforts to obtain voluntary compliance were unsuccessful.

## COUNT I

### Violation of Title VI

200.    The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs.

201.    Yale received, and continues to receive, federal financial assistance for its programs and activities.

29

202.   Yale subjects applicants to Yale College to discrimination on the ground of race.

203.   Yale's use of race is not narrowly tailored to a compelling interest.

204.   Yale's use of race has harmed, and continues to harm, applicants to Yale College, including Asian and White applicants.

205.   Based on all the foregoing, Yale has violated, and continues to violate, Title VI of the Civil Rights Act of 1964.

206.   The United States and applicants to Yale College have suffered damages from Yale's Title VI violation.

207.   Unless restrained by this Court, Yale will continue to violate Title VI.

## COUNT II

## Violation of Title VI Assurances

208.   The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs.

209.   Yale signed contractual assurance agreements with the United States that all of its programs and activities would be conducted in compliance with all requirements of Title VI and its implementing regulations.

210.   Yale's violation of Title VI is a material breach of its contractual assurance agreements.

211.   The United States and applicants to Yale College have suffered foreseeable damages from Yale's breach of its contractual assurance agreements.

212.   Unless restrained by this Court, Yale will continue materially to breach its contractual assurance agreements with the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court grant the following relief:

      (a)   A declaratory judgment, pursuant to the Declaratory Judgment Act, 28

            U.S.C. § 2201, from the Court that Yale's admissions policies and procedures

            violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;

      (b)  A permanent injunction prohibiting Yale from using race as a factor in future

            Yale College admissions decisions;

      (c) A damages award to the United States and injured applicants; and

      (d) All other relief as the interests of justice require.

## **JURY DEMAND**

Plaintiff United States hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  October 8, 2020

 Respectfully submitted,

JOHN H. DURHAM
United States Attorney
District of Connecticut

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

JOHN B. DAUKAS
Principal Deputy Assistant Attorney General
Civil Rights Division

31

_/s/ John B. Hughes_
JOHN B. HUGHES (CT05289)
Civil Chief
United States Attorney's Office
District of Connecticut
157 Church Street, 25th Floor
New Haven, Connecticut 06510
john.hughes@usdoj.gov

_/s/ Matthew J. Donnelly_
SERAJUL F. ALI (PHV10883)
MATTHEW J. DONNELLY (PHV10507)
GENEVIEVE M. KELLY (PHV10884)
JEFFREY G. MORRISON (PHV10881)
Trial Attorneys
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-616-2788
matthew.donnelly@usdoj.gov

Attorneys for Plaintiff
United States of America